```
               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE
```

**Jeffrey Bennett, et al.**

    **v.**                              NH Civil No. 04-ds-401-PB
                                                   ME Civil No. 04-212-GNZ

**St. Paul Fire and Marine**
**Insurance Company, et al.**


**MEMORANDUM AND ORDER**

    In this action, Attorney Jeffrey Bennett and his law firm, The Bennett Law Firm, P.A. (collectively "Bennett"), claim that St. Paul Fire and Marine Insurance Company ("St Paul") breached its contractual duty to fund Bennett's counterclaim against third-party Scott Liberty in a bankruptcy proceeding before the United States Bankruptcy Court in the District of Maine.  Bennett now moves for a preliminary injunction (Doc. No. 8) asking that the court require St. Paul to perform under the contract.  (Doc. No. 8).  For the following reasons, this motion is denied.

## I. BACKGROUND

In early 2002, Bennett purchased a professional liability insurance policy from St. Paul for the period of February 12, 2002 through February 12, 2003. In pertinent part, the policy provides that St. Paul "will have the right and duty to defend any protected person[1] against a claim or suit for loss covered by this agreement," but has no "duty to perform any other acts or services."

"Loss covered by this agreement" includes that which (1) "results from the performance of legal services by or for [the insured]," and (2) "is caused by a wrongful act." A "wrongful act" is defined as any "error, omission, or negligent act."

The alleged "wrongful act" in this case arose out of a contentious divorce suit brought by Attorney Bennett on behalf of his client, Darlene Copp, against her ex-husband, Scott Liberty. The divorce suit was tried aggressively by both sides and has spawned a multiplicity of collateral actions.

---

[1] A "protected person" includes "shareholder[s] in the law firm" of which Bennett is one.

The first that is relevant to this case began on April 9, 2002, when Liberty filed a Chapter 13 petition in the United States Bankruptcy Court in the District of Maine.[2]  As part of this action, Liberty commenced an Adversary Proceeding against Attorney Bennett, claiming that Bennett violated the Automatic Stay provisions of the United States Bankruptcy Code by pursuing matters related to Copp's divorce after the bankruptcy action was filed.  See 11 U.S.C. § 362(a)(2) (2005) (stating that the filing of a petition for bankruptcy "operates as a stay . . . of . . . the enforcement, against the debtor . . . of a judgment obtained before the commencement of the case under this title").  Acknowledging that this suit arguably triggered its duty to defend, St. Paul quickly authorized Attorney Leonard M. Gulino of Bernstein, Shur, Sawyer & Nelson to handle the case on Bennett's behalf.  On June 29, 2002, after Gulino succeeded in having the adversary proceeding dismissed, Liberty moved to abandon his bankruptcy action altogether.  The Bankruptcy Court granted

---

[2]  The bankruptcy proceeding has been characterized by the plaintiffs as part of Liberty's effort to avoid the impositions of an unfavorable outcome in his divorce.  I express no opinion on the merit of this characterization.

Liberty the right to do so, but then reversed jurisdiction on March 19, 2003 to consider, among other things, whether the Court should find that Liberty abused the bankruptcy process and therefore whether claims that Bennett and Copp had made against Liberty should be deemed non-dischargeable in a subsequent filing.

Gulino gave St. Paul's senior adjuster, Michael Spinelli, notice of the voluntary dismissal, the reversal of jurisdiction, and the new issues raised by the Bankruptcy Court in a March 19, 2003 e-mail.  The e-mail states as follows:

> Mike,
>
> We did well today in Court:
>
> 1.  The court dismissed the chapter 13 petition but reversed jurisdiction to:
>
> A) Hear our motion for sanctions against Mike, LLC.[3]  The court also indicated that he believed there was a violation of the Court's discovery order against Mike, LLC and seemed to be saying he will be entering sanctions in some amount.  This has tentatively been set for hearing on 4/16.

---

[3] Mike, LLC is owned by Liberty's uncle, Mike Liberty, a real estate broker who had, at one point, funded Copp's attempts to divorce Liberty, but now serves as Liberty's benefactor.

> Believe it or not, you may be getting some of your fees back.
>
> B) Determine whether the claims of Jeff Bennett should be found to be non dischargeable [sic] in any subsequent bankruptcy case filed by or against Scott. In this regard, the Court seemed to be saying that Scott's Chapter 13 was an abuse of the system. This is very good news because if any obligations owed to Jeff are found to be non dischargeable [sic], it would seem to make it much less likely that an attorney would take a contingency case against Jeff because his claims would offset any claims Scott allegedly has against him.

Spinelli responded to this e-mail the same day by merely stating, "Thanks Len." Gulino then sent another e-mail, dated March 27, 2003, attaching the March 19 e-mail conversation and stating, "I write to confirm that your message is an approval of the action plan sent to you in my e-mail of the [sic] March 19 . . . Please confirm." Spinelli replied the same day, writing, "Len, Approval was granted. Thank you."[4]

Believing this to be an endorsement, Gulino filed a

---

[4] Spinelli "granted approval" in the face of warnings issued by outside counsel to Bennett on June 4, 2002, and September 12, 2003 stating that, "If you or your law firm wish to bring third-party claims, counterclaims, or separate lawsuits against Scott Liberty or other parties, you will need to retain counsel at your own expense to prosecute such claims."

counterclaim on Bennett's behalf against Liberty in United States Bankruptcy Court in January 2004.  The trial began on January 4, 2004, was continued on December 10, and December 13, and was briefly adjourned until January 4, 2005 after which it was adjourned again.  It was during this delay that St. Paul reviewed the history of the case and concluded that it had mistakenly funded Bennett's counterclaim.  Thus, on January 7, 2005, St. Paul advised Gulino that it would cease payment to his firm.[5]  Gulino disputed this decision, and, on January 18, 2005, filed a motion requesting that the Bankruptcy Court either continue the counterclaim action to January 31, or allow Gulino to withdraw as Bennett's counsel.  Gulino's motion was denied on January 24, 2005, and the trial continued on January 31, February 11, and February 16, 2005, with Gulino representing his client through the close of evidence.  The parties are now in the process of preparing post-trial briefs.

---

[5] Notably, without waiving its position, St. Paul subsequently paid Gulino for services rendered in December 2004 and during the first week of January 2004.

In the meantime, Liberty has assembled a team of litigators to bring a multi-claim tort action against Bennett in Maine Superior Court.  The complaint, which Bennett became aware of during the bankruptcy proceeding, was ultimately filed in Cumberland County on July 25, 2003, and has subsequently been stayed.

This suit was commenced on September 1, 2004, and was referred to the District of New Hampshire, which now sits by designation.  Bennett claims that the action brought in the United States Bankruptcy Court and the tort action in Maine Superior Court are inextricably intertwined.  According to Bennett, this is true because (1) they are based on the same general transactions and occurrences, and (2) the bankruptcy proceeding is necessary to preserve a number of potential counterclaims and defenses that may arise in the tort action. Bennett therefore argues that if St. Paul has a duty to defend him in the tort action,[6] it also has a duty to defend him through

---

[6] Bennett claims it does.

-7-

the remainder of the bankruptcy proceeding.[7]

The matter is before me on Bennett's motion for a preliminary injunction.

## II.  STANDARD OF REVIEW

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."  CMM Cable Rep. v. Ocean Coast Prop., 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. U.S. Dist. Ct. Cent. Dist., 840 F.2d 701, 704 (9th Cir. 1988); Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)). Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused by the defendant. CMM Cable Rep., 48 F.3d at 620.

---

[7] Bennett additionally claims that his reliance on what he considers to be St. Paul's initial approval should estop St. Paul from now disclaiming liability.  Because I deny Bennett's motion on other grounds, I do not reach the merits of this or any other substantive claim about the existence and scope of promises made by the parties during the course of their relationship.

A district court may grant a plaintiff's request for a preliminary injunction if the plaintiff establishes: (1) that the plaintiff is likely to succeed on the merits; (2) that the plaintiff will suffer irreparable harm if the injunction is not granted; (3) that the injury to the plaintiff outweighs any harm which granting the injunction would inflict on the defendant; and (4) that the public interest will not be adversely affected by the granting of the injunction.  Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000); Public Serv. Co. v. Patch, 167 F.3d 15, 25 (1st Cir. 1998).  A party seeking a preliminary injunction must independently satisfy each of the four factors in order to be granted relief.  Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981); Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness, 649 F.2d 71, 74 (1st Cir. 1981).

### III.  DISCUSSION

St. Paul's strongest argument is that Bennett has failed to demonstrate that the denial of a preliminary injunction will lead to irreparable harm.  Only a viable threat of serious harm which

cannot be undone authorizes a court to enjoin a party before the merits are fully determined.  Mass. Coalition of Citizens with Disabilities, 649 F.2d at 74.  Thus, equity ordinarily does not supply relief where legal remedies suffice.  Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 61 (1st Cir. 1998).  The availability of damages in the enforcement of a contract has therefore rendered injunctive relief "the exception rather than the rule."  Id.   This is especially the case when the requested preliminary injunction has "mandatory aspects."  See Dept. of Env. Prot. v. Emerson, 563 A.2d 762, 768 (Me. 1989).

Such is the case here.  Bennett seeks a mandatory preliminary injunction to enforce his interpretation of the contractual agreement with St. Paul.  He claims that he will suffer both "representational harm" and harm to his reputation if a preliminary injunction is not issued.  These injuries, he argues, would render money damages in the form of coverage for the cost of litigation an inadequate remedy.

I do not share Bennett's view.  As to his claim that withholding a preliminary injunction would result in irreparable representational harm, it is undisputed that Gulino has been his

lawyer throughout this litigation, and that any attempts by Gulino to withdraw have been rejected by the Bankruptcy Court. Gulino therefore continues to be bound by his duty to diligently prosecute Bennett's claims, regardless of the source of his remuneration or the risk that it may not be forthcoming. <u>Bd. of Overseers of the Bar v. Mangan</u>, 2000 Me. Lexis 223, *5 (Me. 2000) (disbarring a lawyer for breaching his duty of diligence). There is no indication that Gulino understands otherwise.[8] Bennett's claim that his representation will somehow be marred by St. Paul's failure to provide funding up-front therefore has no merit.

The same holds true with respect to Bennett's claim that denying him an injunction at this stage will somehow harm his reputation. As an initial matter, Bennett provides no explanation as to how this harm will come to pass. Indeed, it is difficult to understand how losing a dispute with an insurance

---

[8] Indeed, Gulino appears to have acknowledged his continuing duty in a January 7, 2005 letter he drafted to St. Paul's outside counsel, Attorney John Whitman, in which he stated that despite St. Paul's position on the matter, Gulino "continue[s] to have representational obligations to the insured."

company over professional liability coverage could effect Bennett's reputation at all.  It may be that Bennett has assumed that Gulino will not put his best efforts forward without some assurance in advance that he will be paid either by his client or by St. Paul.  Bennett may thus also believe that any resulting loss could damage his standing in the community.  As I have discussed, however, these fears are built upon assumptions about Gulino's likely performance that are unwarranted.

In the absence of any credible argument stating otherwise, the only injuries Bennett could claim he suffers from stem from the litigation costs that his lawyers have generated, and continue to generate in post-trial activity.[9]  These he may recoup as money damages if he ultimately prevails on the merits of his breach of contract claim.

That he may do so forecloses the possibility of preliminary injunctive relief in this case.  "If money damages will fully alleviate harm, then the harm cannot be said to be irreparable."

---

[9] Even these have been mitigated by St. Paul, who has agreed to pay Gulino for services rendered in December 2004 and during the first week of January 2004.

K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989).  In this case, "money damages" will fully alleviate any harm asserted by Bennett.  His preliminary injunction must therefore be denied.

### III. CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied (Doc. No. 8).

SO ORDERED.

                                  /s/Paul Barbadoro
                                  Paul Barbadoro
                                  United States District Judge, DNH
                                  Sitting by designation

June 28, 2005

cc:   Jens-Peter Bergen, Esq.
      Anne Cressey, Esq.
      Paul Douglass, Esq.
      John Whitman, Esq.
      Clerk-USDC, ME